**In the United States District Court
for the District of Kansas**

---

**United States of America**,
               Plaintiff,

v.                                     Case No. 25-10050-01 EFM

**Addilynn Jean Onuffer,**
               Defendant.

---

**Sentencing Memorandum**

---

Addilynn Onuffer asks this Court to impose a sentence of eight years of imprisonment, followed by five years of supervised release. We believe this sentence reflects critical factors—Addilynn's age and adverse childhood experiences; her family support; and her low risk of recidivism, and high likelihood of successful rehabilitation—while also balancing the severity of the charges and the need for punishment.

1. **Addilynn's history and characteristics, as well as the nature and circumstances of the offense, support an eight-year sentence.**

When fashioning Addilynn's sentence, the Court must consider her history and characteristics, as well as the nature and circumstances of the offense.[1] Addilynn's own experience of childhood sexual assault plays a crucial role in understanding these factors. This background, when viewed through the lens of modern social

---

[1] 18 U.S.C. § 3553(a)(1).

sciences aiming to understand the cause of sexual offenses and rehabilitation of sex offenders, is provided to help the Court understand how Addilynn, an otherwise smart, hard-working, law-abiding young woman, became involved in the offense.

### a. Addilynn's Adverse Childhood Experiences

Growing up, Addilynn's biological father was only present for the first few years of her life.[2] He and her mother were married when Addilynn was born, but separated when she was a toddler. Her parents shared custody of Addilynn during the separation. During a visit with her father, Addilynn suffered sexual abuse at the hands of a family friend.[3] Although she was only a toddler, Addilynn reported the abuse to her mother. She exhibited signs of an injury and was taken to the hospital for a formal examination. No charges were brought, but when Addilynn's parents later divorced, Addilynn's mother was granted a no-contact order between Addilynn and one of the individuals who allowed the abuse to occur through their negligence.

Only a few years later, Addilynn suffered sexual abuse at the hands of her older stepsister.[4] This abuse occurred often and was long-lasting: It began when Addilynn was around six years old and occurred almost daily for at least four years. Because Addilynn shared a bedroom with her abuser, there was no safe place she could escape to, no privacy to hide from the abuse. Addilynn's reaction to the abuse was complicated by her age and naivete. As part of the cycle of abuse, her stepsister

---

[2] Final Pre-Sentence Investigation Report (PSR), D.E. 61, ¶ 157.
[3] PSR ¶ 184.
[4] PSR ¶ 162, 183.

worked hard to convince Addilynn that the abuse was both a secret to be kept from adults, and a normal interaction among siblings and family members. Addilynn struggled with the dissonance between the repeated affirmation from her older sibling that this was normal, and her own internal understanding that it was profoundly inappropriate. Out of shame and confusion, Addilynn silently lived with the abuse and its effects for years after it ended.

This abuse, and Addilynn's struggle to make sense of it, had long-term effects on Addilynn's ability to form and maintain friendships and intimate relationships. Addilynn "developed conflicting perceptions of safety and interpersonal relationships" and had "difficulty understanding how and where to establish appropriate boundaries, as well as challenges in determining whom to trust, assessing others' intentions, and distinguish between appropriate and inappropriate behavior in social interactions."[5] This often led to Addilynn engaging in relationship dynamics where she worked hard to be agreeable and servile, even when the other person treated her poorly or asked her to do things she knew were inappropriate or harmful. In short, Addilynn acted against her own self-interest and her own sense of what was right and wrong to appease other people.

**b. Social Sciences**

Addilynn's story is not uncommon among people convicted of sex offenses. Studies show that Adverse Childhood Experiences (for example, sexual, physical and emotional abuse; child neglect; and family dysfunction like absent parents,

---

[5] PSR ¶ 183.

mental illness, and substance use) may be a contributing factor in sexual offending behaviors.[6] A study of women incarcerated for Child Sexual Abuse Material (CSAM) offenses found that, when compared with females in the general population, women who commit sexual offenses are 3x more likely to have experienced child sexual abuse, four times more likely to have experienced verbal abuse, and more than three times as likely to have experienced emotional neglect.[7] Of the women surveyed, 50% of the women were subject to sexual abuse in childhood.[8] These women had more than three times the odds of having been sexually abused as a child than women in the general population, and they also had higher rates of having been sexually abused than males who had perpetuated sexual offenses.[9] In an effort to understand this correlation, Dr. Jill Levenson, a leading expert in scholarship around sex offender treatment, posits that "[t]he cumulative stress of childhood adversity leads to social, emotional, and cognitive impairment, and traumatized individuals often adopt high-risk behaviors as part of a continuum of maladaptive coping strategies."[10]

In the 2022 article, "Hurt People Hurt Other People: The Link Between Past Trauma and Sexual Offending," Dr. Melissa D. Grady summarizes the ways that childhood trauma directly and indirectly influences a person's thought processes, interpersonal relationships, and decision-making abilities:

---

[6] Jill S. Levenson, Gwenda M. Willis & David S. Prescott, *Adverse Childhood Experiences in the Lives of Female Sex Offenders*, 27(3) SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT, 258–283 (2015).
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*

Developmental trauma is also known as complex trauma or relational trauma, and results from repeated and prolonged exposure to child abuse, neglect, and family dysfunction. Trauma can impact development in many ways. On a physical level, chronic toxic stress in childhood stimulates production of hormones that create a hyper-aroused state in which the brain scans the environment for danger; the body is prepared to respond to threats with a fight, flight, or freeze survival mode. As a result, cognitive processing might be impaired, causing deficits in executive functions such as impulse control and strategic decision-making. Interpersonally, children who grow up with insecure attachments might have poor models for healthy intimacy and effective relationship skills. Insecure attachments are also associated with emotional dysregulation, which can contribute to sexualized coping and congruence with minors. As such, the neurocognitive and psychosocial consequences of early trauma are thought to contribute to the potential for sexual offending, although the exact mechanisms remain unclear.[11]

Addilynn faced many of the factors described by Dr. Grady: child sexual abuse; neglect from her biological father; family dysfunction from her father's abandonment and the abuse she received from her stepsister. And as the research suggests, Addilynn experienced many of the emotional and attachment issues that are correlated with childhood trauma: She struggled to form healthy relationships with others; she failed to create safe or rational boundaries with her spouse; and she established unhealthy strategies to cope with her emotional dysregulation. Addilynn's decision to participate in the offense conduct is, at least partly, a result of her own abuse and the way it affected her decision-making as a young adult.

This information is relevant to the Court's sentencing decision. 18 U.S.C. § 3553(a) allows the Court to consider Addilynn's motivations when contemplating

---

[11] Melissa D. Grady et al., *Hurt People Hurt Other People: The Link Between Past Trauma and Sexual Offending*, 17 SEXUAL OFFENDING: THEORY, RESEARCH, AND PREVENTION 1, 3 (2022).

what sentence is appropriate.[12] It also allows the Court to consider Addilynn's

mental health status[13] and her age and maturity[14] at the time of the offense.[15] And

as is discussed *infra* in Part 4, by better understanding the complicated mental,

emotional, and social factors that contributed to Addilynn's criminal conduct, we

can also understand what is truly needed to ensure Addilynn's rehabilitation.

**2. An eight-year sentence provides sufficient punishment.**

We turn next to the sentencing considerations laid out in 18 U.S.C. § 3553(a)(2).

The first sentencing purpose under this subsection, "to reflect the seriousness of the

offense, to promote respect for the law, and to provide punishment for the offense,"[16]

is more succinctly labeled "retribution."[17] According to the Sentencing Commission,

"[u]nder this principle, punishment should be scaled to the offender's culpability

and the resulting harms."[18]

We admit that this is a serious offense that resulted in serious harms. Given the

nature of the crime, we believe that an eight-year sentence is sufficient but not

greater than necessary for the purpose of retribution. Eight years is a significant

sentence for anyone to serve, but it is especially long for a 22-year old with no

criminal history, and to the contrary, a history of law-abidingness, employment,

education, and community involvement.

---

[12] 18 U.S.C. § 3553(a)(1); *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Chavez-Morales*, 894 F.3d 1206, 1214 (10th Cir. 2018).
[13] *United States v. DeRusse*, 859 F.3d 1232, 1238 (10th Cir. 2017).
[14] *Gall v. United States*, 552 U.S. 38, 58 (2007).
[15] 18 U.S.C. § 3553(a)(1).
[16] 18 U.S.C. § 3553(a)(2)(A).
[17] *Tapia v. United States*, 564 U.S. 319, 325 (2011).
[18] U.S.S.G. Ch. 1, Pt. A3.

Because of the nature of her conviction, Addilynn will not have an opportunity to accumulate Earned Time Credits to shave time off of her prison sentence, or to earn additional time in the half-way house. She went into custody at age 21 and will leave custody nearly 30 years old.

Following prison time, Addilynn's punishment will continue for at least five years through her supervised release. While this supervision will assist with her rehabilitation, it is also a part of her overall sentence, and imposes restrictions on her travel, her internet access, her employment, her ability to associate with others—nearly every aspect of her life.[19] Even after her term of supervised release ends, the existence of a sexual offense conviction, and Addilynn's status as a registered offender, will create collateral consequences on her personal and professional life that will last the rest of her life.

While the guideline calculation calls for a sentence of 210-240 months (17.5 – 20 years) of imprisonment, we believe a sentence of this length would be far longer than necessary to serve the interests of justice and the § 3553(a) factors. The high end of the Guideline is nearly as long as the amount of time that Addilynn has been alive—notably, she was 20 years old at the time that Counts 1, 2 and 3 of the Superseding Indictment occurred. Even the low end of the range, 17.5 years, reflects nearly her entire life span so far. A sentence in the Guideline range represents an extraordinary punishment that fails to take into account Addilynn's age at the time of the offense and sentencing; the impact that her adverse childhood experiences

---

[19] PSR ¶ 216-243 (listing mandatory, standard, and special conditions of supervised release).

had on her mental and emotional state and her decision-making processes at the time of the offense; and her ability for rehabilitation. While a sentence of this length may be *sufficient* punishment, is it certainly greater than necessary, and serves only the interests of punishment without taking into account the other statutory factors this Court must consider.

3. **Recidivism rates for women convicted of sex offenses are low; a 17-year sentence is greater than necessary for deterrence or protection of the public.**

This Court is required to consider the need for the sentence imposed to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes."[20] Given the low sexual recidivism rates among women offenders, an eight-year sentence is sufficient to promote adequate deterrence and incapacitation. In general, recidivism rates for sex offenders are low.[21] A 2010 study aggregated data from ten studies of recidivism rates among sex offenders and found that women convicted of sex offenses had "extremely low" rates of reoffending with the same type of crime.[22] An updated study conducted in 2024 produced similar results: Based on the new data, only 3.1% of women studied were known to have sexually reoffended within 10 years of the end of their prison or probation term.[23] In comparison, male sex offenders are believed to have a recidivism rate somewhere between 5% and 15% within ten years of finishing their sentences.[24]

---

[20] 18 U.S.C. § 3553(a)(2)(B) and (C).
[21] Franca Cortoni & R. Karl Hanson, *The Recidivism Rates of Female Sex Offenders Are Low: A Meta-Analsys*, 22 SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT 387 (2010).
[22] *Id.*
[23] R. Karl Hanson, Franca Cortoni, & Jeffrey Sadler, *The Sexual Recidivism Rates of Women Are Still Low: An Updated Meta-Analysis*, 36 Criminal Behavior and Mental Health 53 (2026).
[24] *Id.*

These studies provide "clear evidence that female sexual offenders, once they have been detected and sanctioned by the criminal justice system, tend not to reengage in sexual offender behavior. Most female sexual offenders are not convicted of any new crimes, and of those who are, they are 10 times more likely to be reconvicted for a nonsexual crime than a sexual crime."[25]

Certain protective factors correlate with even lower recidivism rates. For example, studies consistently show that strong family support and interpersonal relationships are correlated with a lower risk of recidivism for women.[26] This is largely due to the support a person receives when they reenter society after prison: If they have family support to find a job, find housing, and reintegrate into a social unit, women are more likely to achieve stability, and less likely to reoffend.[27] For people convicted of sex offenses, sex offender treatment therapy can also to lower recidivism rates, especially when voluntary.[28]

When it comes to risk of reoffending, Addilynn's family support and commitment to treatment benefit her greatly. Addilynn has no criminal history, sex offenses or otherwise. She has no history of uncharged criminal conduct, substance use, or housing instability. As discussed below, Addilynn had—and continues to have—

---

[25] Cortoni, *supra* note 21 at 396.
[26] Elizabeth Piper Deschenes, Barbara Owen, & Jason Crow, *Recidivism Among Female Prisoners: Secondary Analysis of the 1994 BJS Recidivism Data Set. Report*, Report, BUREAU OF JUSTICE STATISTICS, 6-8 (2007).
[27] *Id.*
[28] Nichola Tyler, Theresa A. Gannon & Mark. E. Olver, *Does Treatment for Sexual Offending Actually Work?*, 23 Current Psychiatry Reports 51, 51 (2021) ("With regard to coercion, findings from the wider literature on correctional treatment programs suggest that mandated treatment in custodial settings is particularly ineffective, while voluntary treatment produces significant effects regardless of treatment setting").

significant support from her family, with whom she remains close. Some family and friends have provided letters of support, which are attached to this memorandum.[29] Others intend to speak on her behalf at sentencing. She has the intent and the opportunity to attend sex offender treatment therapy and cognitive behavioral therapy both in and out of custody. Thus, in addition to a statistically very low likelihood of recidivism, Addilynn benefits from protective factors that will further support her post-incarceration stability and success. Therefore, there is no need for a decades-long sentence to ensure adequate deterrence and protect the public. Eight years is sufficient, but not greater than necessary, to further these purposes.

**4. An eight-year sentence allows opportunities for rehabilitation while Addilynn is still young.**

When determining Addilynn's sentence, this Court must "consider . . . the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"—in short, to allow for Addilynn's rehabilitation.[30] Having accepted responsibility, and having submitted herself to a certain prison sentence, Addilynn seeks an eight-year sentence in part because it provides significant punishment while also allowing her an opportunity for rehabilitation while she is still relatively young. Addilynn, who is 22 years old, is more susceptible to

---

[29] See Attachment A.

[30] 18 U.S.C. § 3553(a)(2)(D).

rehabilitation than older defendants,[31] and intends to take advantage of every opportunity she has both during and after her term of imprisonment.

From the beginning of her interaction with law enforcement, Addilynn was honest and remorseful about her conduct and sought ways to rehabilitate herself. Addilynn was first contacted by law enforcement on April 29, 2025. On that date law enforcement officers called her in for questioning related to a tip from the National Center for Mission and Exploited Children that indicated someone in her household had accessed child pornography.[32] Although Addilynn was called in for questioning about her husband, Gavin Onuffer, Addilynn quickly admitted that she was responsible.[33] This was a fulsome admission: She admitted not just to accessing child pornography, but also to distributing it.[34]

Even before this interview, Addilynn had recognized that her thoughts and actions were a serious problem. Earlier in the spring of 2025, Addilynn had sought help from a therapist to discuss the same mixture of childhood trauma, relationship issues, and depression that led her to the instant conduct. She was in counseling for these issues when she was arrested in May 2025.

Addilynn again sought out rehabilitation while in pretrial custody. Working with members of the defense team, Addilynn tried to set up mental health services, and

---

[31] *See, e.g., Miller v. Alabama*, 567 U.S. 460, 461 (2012) (noting that juvenile and adolescent's traits are "less fixed" and more susceptible to rehabilitation).
[32] PSR ¶ 33.
[33] *Id.* at ¶ 34.
[34] *Id.*

particularly sex offender treatment therapy, at the county jail.[35] The defense team

identified a treatment provider in Wichita willing to provide sex offender treatment

in the jail. Unfortunately, because of Addilynn's indigency and lack of insurance,

she was unable to afford these services. Nonetheless, Addilynn continued to work on

herself, studying workbooks and scholarly articles to better understand how her

childhood abuse affected her decision to engage in this criminal conduct. She also

took classes through Edovo, a virtual learning platform offered at Butler County

Jail. She focused on classwork that would help her plan for the future, completing

courses like "Boss of My Brain," "How Can I Heal From Child Sexual Abuse?" and

"Parenting While Incarcerated."[36]

Addilynn seeks to begin her rehabilitation journey in earnest in the Bureau of

Prisons. She plans to attend BOP's Residential Sex Offender Treatment Program, a

12-to-18 month residential program through which individuals convicted of sex

crimes can receive intensive education and psychological rehabilitation.

Institutional studies indicate that the RSOTP is successful at lowering recidivism

rates.[37] In general, voluntary sex offender treatment is successful at lowering

recidivism rates regardless of whether it takes place in or out of custody.[38]

---

[35] Addilynn received assistance from Genevieve Manzanarez, LMSW, a Mitigation Specialist, and Nicole Araiza, a Social Work intern, both employed by the office of the Federal Public Defender for the District of Kansas.

[36] See Attachment B.

[37] Roger Przybylski, *Effectiveness of Treatment for Adult Sex Offenders*, Sex Offender Management Assessment and Planning Initiative, U.S. Department of Justice (2015). https://smart.ojp.gov/somapi/chapter-7-effectiveness-treatment-adult-sex-offenders

[38] Tyler, *supra* note 28.

Individuals are usually eligible to participate in this program during the last three years of their sentence.[39]

Until then, Addilynn may be eligible for other rehabilitation-oriented programs at a prison with a Sex Offender Management Program. Addilynn understands that she is not eligible for Earned Time Credits or other sentence reductions for her involvement in these programs—she intends to seek treatment for her own good, and for the good of the community, not as a means to a shorter sentence. Addilynn respectfully requests that the Court recommend designation to the closest facility to Harrah, Oklahoma with a Sex Offender Management Program, to facilitate both family visitation and appropriate programming.

Addilynn also plans to continue her education in the Bureau of Prisons. She hopes to take post-secondary education classes and work toward her college degree. She also wants to continue taking classes related to parenting, cognitive behavioral therapy, and trade skills that might help her find a career. As an intelligent, caring young woman, Addilynn wants to use her incarceration to sharpen her mind and open new paths for her future employment and stability.

Addilynn's family have been a tremendous support system for Addilynn through her entire life. This has not changed since her arrest. While they are fully aware of the nature and facts of the case, members of Addilynn's immediate and extended have supported Addilynn emotionally through her pretrial and presentencing process, and through the difficult task of giving birth while in custody. They have

---

[39] Sex Offenders, Federal Bureau of Prisons (last accessed May 6, 2026)
https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp

promised their support to Addilynn in the coming years, through her incarceration and her return home. Part of that support includes holding her accountable for her past actions, and holding her to a high standard for her behavior in the future.

Although it is a long way away, Addilynn looks forward to her reintegration into the community after prison. Through long conversations with her family, she has a tentative plan for what that reintegration would look like. Addilynn plans to continue mental health counseling and, as appropriate and available, sex offender treatment therapy, after her release from prison. She and her parents have already begun looking into treatment options near their home in Harrah, Oklahoma.

Finally, Addilynn hopes to be a part of her daughter's life, but knows that she will need to work on herself before she is prepared for that reunion. In the meantime, Addilynn's daughter is being raised by Addilynn's parents, who have a permanent guardianship over their granddaughter. Given counseling, time, and with family support, Addilynn envisions a future where she can live a stable life and create a lasting, meaningful relationship with her daughter.

Respectfully submitted,

s/ Ellen Bertels
ELLEN BERTELS
Sup. Ct. No. 28938
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6170
Fax: (316) 269-6175
E-mail: Ellen_Bertels@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court on May 6, 2026, by using the CM/ECF system, which will send a notice of electronic filing to all interested parties.

s/ Ellen Bertels
ELLEN BERTELS, #28938
